# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMCA-061

Filing Date: June 22, 2021

No. A-1-CA-38286

STATE OF NEW MEXICO,

     Plaintiff-Appellee,

v.

HAROLD ATENCIO,

     Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
Karen L. Townsend, District Judge

Certiorari Granted, November 5, 2021, No. S-1-SC-38869. Released for Publication December 14, 2021.

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**MEDINA, Judge.**

**{1}** This Court issued an opinion on June 3, 2021, which is hereby withdrawn and replaced with this opinion, granting both the State and Defendant's motions for rehearing.

**{2}** Defendant appeals his convictions for one count of criminal sexual penetration of a minor (CSPM), in violation of NMSA 1978, Section 30-9-11(D)(1) (2009), and twenty-one counts of criminal sexual contact with a minor (CSCM), in violation of NMSA 1978,

Section 30-9-13(B)(1) (2003). On appeal, Defendant contends that: (1) he received inadequate *Miranda* warnings and therefore, the admission of his video recorded statement was error; (2) alternatively, his counsel was ineffective for not challenging the adequacy of the *Miranda* warnings he received; and (3) the "carbon-copy" charges, evidence presented, and instructions to the jury violated his rights to due process, to be free from double jeopardy, and to a unanimous jury verdict, and that the evidence was insufficient to support his multiple CSCM convictions.

**{3}**     Because the *Miranda* warnings Defendant received did not adequately convey the right to the presence of an attorney prior to and during Defendant's custodial interview with law enforcement, we agree with Defendant that the admission of his video recorded statements was error. There is, however, sufficient evidence to support each of Defendant's convictions and thus retrial is permitted. In light of our holding regarding the admission of Defendant's statements, we do not address Defendant's ineffective assistance of counsel claims, nor do we review his double jeopardy challenges. We therefore reverse Defendant's convictions and remand for a new trial.

**BACKGROUND**

**{4}**     The following facts were introduced at the pretrial motion hearing and at trial. Victim (C.Y.) is the child of Kimberly G. (Mother) and Jeffrey Y. (Father). From June 2017 until October 2017, while Father lived in Florida, C.Y. lived with Mother, his stepfather, and three siblings—including his older sister (A.Y.)—in a rented trailer in Kirtland, New Mexico. C.Y. was ten years old.

**{5}**     Defendant lived in the trailer next door to C.Y.'s family. C.Y. testified that he would go over to Defendant's trailer every day and that they would watch movies together. According to Mother, C.Y. stayed the night at Defendant's trailer a few times and would occasionally sneak over to visit Defendant without her permission.

**{6}**     For reasons unrelated to this case, the Children, Youth and Families Department (CYFD) removed C.Y. and A.Y. from Mother's custody in October 2017. CYFD placed C.Y. and A.Y. in Father's custody, and they moved to Florida to live with him. Soon thereafter, Father became aware that a former neighbor may have sexually abused C.Y. in New Mexico. Father reported the alleged abuse to law enforcement, after which Safehouse interviews of C.Y. and A.Y. were conducted in Florida. The case was assigned to Detective Nima Babadi of the San Juan County Sheriff's Office. During his investigation, Detective Babadi identified Defendant as the suspect in the case.

**{7}**     On March 20, 2018, Detective Babadi invited Defendant to come to the sheriff's department to discuss a residential burglary that Defendant had previously reported. Detective Babadi and Defendant met in an interview room, and after a brief discussion about the burglary, Detective Babadi informed Defendant that he wanted to speak with him about another case.

**{8}** Prior to informing Defendant about his investigation into C.Y.'s disclosures and prior to questioning Defendant about the reported sexual abuse, Detective Babadi notified Defendant of his *Miranda* rights as follows, "You have the right to remain silent; anything you say may be used against you. You have a right to a lawyer; and if you cannot afford a lawyer, one will be provided for you." Defendant verbally acknowledged that he understood his rights and signed a waiver of rights form indicating the same.[1]

**{9}** Detective Babadi proceeded to tell Defendant that he had "done his homework," that he knew Defendant had been touching C.Y., and that he just wanted to know why Defendant had been touching C.Y. Defendant initially claimed that "if" he ever touched C.Y., such touching was accidental and he "never meant anything by it." Defendant eventually admitted that he had touched C.Y.'s penis between twenty and thirty times, that he "didn't really play with him that much," and that he had once briefly put C.Y.'s penis in his mouth. At the conclusion of the interview, Detective Babadi arrested Defendant.

**{10}** Prior to trial, the State filed a motion entitled, "Motion to Admit Defendant's Statements to Law Enforcement," asserting that "Defendant was properly Mirandized and his statements were knowingly, intelligently, and voluntarily made." The State made no claim that Defendant was not the subject of a custodial interview. Defendant did not file a written response to the motion.

**{11}** During the hearing on the State's motion, Defendant argued that his *Miranda* waiver was not knowing, intelligent, and voluntary. After hearing testimony from Detective Babadi and reviewing Defendant's video-recorded interview, the district court ruled that it "[saw] no problems at all with this *Miranda* waiver and any statements [were] going to be allowed [at trial]." Defendant's interview with Detective Babadi was admitted at trial. Defendant was convicted of one count of CSPM and twenty-one counts of CSCM.

**{12}** Fifteen days after Defendant's jury trial, the district court memorialized its ruling from the bench on the admission of Defendant's statements to law enforcement. In a written order, the district court concluded, in part, that "Defendant was not in custody and the advisement of rights under *Miranda* was not required." The district court further found that Detective Babadi was not legally required to advise Defendant of his rights under the Fifth Amendment, but "[t]o the extent a waiver of rights was required, Defendant's written waiver was voluntarily, knowingly[,] and intelligently executed." This appeal followed.

## DISCUSSION

### I. Defendant's Argument That His *Miranda* Warnings Were Inadequate Was Not Preserved

---

[1]The waiver of rights form also included *Miranda* warnings.

**{13}** Defendant's challenge to the district court's admission of his video-recorded statement is akin to an appeal of a denied motion to suppress. "The district court's denial of [a d]efendant's motion to suppress evidence presents a mixed question of fact and law." *State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183. "This Court reviews factual matters with deference to the district court's findings if substantial evidence exists to support them, and it reviews the district court's application of the law de novo." *Id.*

**{14}** Defendant argues that the *Miranda* warnings he received were inadequate because he was not informed of his right to consult with an attorney prior to being questioned by Detective Babadi. Defendant acknowledges that this claim may be unpreserved for review on appeal. We agree with Defendant that this issue was unpreserved.

**{15}** In *State v. Montoya*, our Supreme Court explained that "[i]n order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon." 2015-NMSC-010, ¶ 45, 345 P.3d 1056 (internal quotation marks and citation omitted); *see also* Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked.").

> We require parties to assert the legal principle upon which their claims are based and to develop the facts in the trial court primarily for two reasons: (1) to alert the trial court to a claim of error so that it has an opportunity to correct any mistake, and (2) to give the opposing party a fair opportunity to respond and show why the court should rule against the objector.

*State v. Gomez*, 1997-NMSC-006, ¶ 29, 122 N.M. 777, 932 P.2d 1.

**{16}** Here, Defendant's objection at the evidentiary hearing was focused squarely on whether his *Miranda* waiver was knowing, intelligent, and voluntary—not whether his *Miranda* warnings were in fact adequate. *Miranda* warnings are an explanation of the constitutional rights afforded to individuals suspected of a crime under the Fifth Amendment, whereas *Miranda* waivers are a renouncement of those rights. *See State v. Salazar*, 1997-NMSC-044, ¶¶ 59-64, 123 N.M. 778, 945 P.2d 996 (describing the defendant's challenges to both the adequacy of the *Miranda* warnings he received and his waiver of those same rights); *see also State v. Verdugo*, 2007-NMCA-095, ¶ 13, 142 N.M. 267, 164 P.3d 966 (explaining that both *Miranda* warnings and *Miranda* waiver must be proven by the prosecution in order to admit evidence obtained from custodial interrogations). Because Defendant's objection at the evidentiary hearing focused on the waiver of his rights—which is not the same argument he raises here on appeal—the issue of whether Defendant received adequate *Miranda* warnings was unpreserved and we review only for fundamental error. *See State v. Bregar*, 2017-NMCA-028, ¶ 29, 390 P.3d 212 ("[F]or an objection to preserve an issue for appeal, it must appear that the appellant fairly invoked a ruling of the district court *on the same grounds argued in the*

*appellate court*." (emphasis added) (alterations, internal quotation marks, and citation omitted)).

**{17}** In *State v. Cunningham*, our Supreme Court explained that

> [e]rror that is fundamental must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive. Each case will of necessity, under such a rule, stand on its own merits. The doctrine of fundamental error is to be resorted to in criminal cases only for the protection of those whose innocence appears indisputably, or open to such question that it would shock the conscience to permit the conviction to stand. Fundamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand.

2000-NMSC-009, ¶ 13, 128 N.M. 711, 998 P.2d 176 (internal quotation marks and citations omitted). "The first step in reviewing for fundamental error is to determine whether an error occurred. If that question is answered affirmatively, we then consider whether the error was fundamental." *State v. Silva*, 2008-NMSC-051, ¶ 11, 144 N.M. 815, 192 P.3d 1192 (citations omitted). In order to determine whether an error occurred with regard to the adequacy of the *Miranda* warnings in this case, we first determine whether *Miranda* warnings were required.

## II.     Defendant Was in Custody for Purposes of *Miranda*

**{18}** "Prior to any custodial interrogation, a person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *State v. Widmer*, 2020-NMSC-007, ¶ 12, 461 P.3d 881 (alteration, internal quotation marks, and citation omitted). However, *Miranda* warnings only apply when (1) the person is in custody; and (2) any questioning meets the legal definition of interrogation. *See id.* ¶ 13. There is no dispute that Defendant was interrogated, therefore the focus of our inquiry is whether Defendant was in custody for purposes of *Miranda* during his interview.

**{19}** "Custody is defined as either (1) a formal arrest, or (2) a restraint on freedom of movement of the degree associated with a formal arrest." *State v. McNeal*, 2008-NMCA-004, ¶ 10, 143 N.M. 239, 175 P.3d 333 (internal quotation marks and citation omitted). To determine whether a suspect was in custody, we apply an objective test: "[W]as there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest[?]" *State v. Wilson*, 2007-NMCA-111, ¶ 14, 142 N.M. 737, 169 P.3d 1184 (internal quotation marks and citation omitted). "Because the test is objective, the actual subjective beliefs of the defendant and the officer as to whether the defendant is in custody are irrelevant." *Id.* Rather, we consider how "a reasonable man

in the suspect's position would have understood his situation." *Id.* (internal quotation marks and citation omitted).

**{20}** In the event that there is no formal arrest prior to questioning, "our appellate courts engage in a fact-specific analysis of the totality of the circumstances under which the questioning took place in order to decide whether the custody requirement is met." *State v. Olivas*, 2011-NMCA-030, ¶ 10, 149 N.M. 498, 252 P.3d 722. The following factors guide our inquiry: "the purpose, place, and length of interrogation[,] . . . the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant." *State v. Munoz*, 1998-NMSC-048, ¶ 40, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citation omitted).

**{21}** Defendant drove to the sheriff's department on his own accord for the purpose of discussing the burglary of his trailer with Detective Babadi. Defendant did not know, however, that Detective Babadi also invited him to the sheriff's department because he wanted to speak with him about C.Y.'s disclosures. *Contra Olivas*, 2011-NMCA-030, ¶ 13 ("We recognize that our courts have considered a defendant's willingness to meet with officers . . . to be a factor, among others, in favor of holding that an interrogation is non-custodial."). Because this factor alone is not determinative as to custody, our analysis continues. *See id.*

**{22}** Once at the sheriff's department, Defendant was interviewed by Detective Babadi in a small interview room. The video recording of the interview reveals that Defendant was not handcuffed, that Detective Babadi was dressed in plain clothes with a firearm holstered to his side, and that no other officers were in the interview room. We additionally observe there is no indication that the door was locked as Detective Babadi stepped out of the interview room on more than one occasion without the use of keys. *See Munoz*, 1998-NMSC-048, ¶ 43 ("There is no indication the car doors were locked during the interrogation, or that [the defendant] was prevented from leaving the car.").

**{23}** The video recording further reveals that Detective Babadi sat across from Defendant at a small table and then later moved between Defendant and the door. *See State v. Nieto*, 2000-NMSC-031, ¶ 21, 129 N.M. 688, 12 P.3d 442 ("However, the fact that the office was small, that [the d]efendant's back was to the wall of the office, that an officer was situated between [the d]efendant and the doorway, and that the door was closed do not, in and of themselves, indicate a formal arrest or suggest that [the d]efendant's freedom of movement was restricted to an extent consistent with a formal arrest."); *State v. Bravo*, 2006-NMCA-019, ¶ 11, 139 N.M. 93, 128 P.3d 1070 (explaining that the officers' positioning between the defendant and the doorway was "not, by itself, enough to make [the d]efendant's interview custodial"). Taken together, these factors do not weigh in favor of a determination that Defendant was in custody. However, since the question of custody requires "a fact-specific analysis of the totality of the circumstances under which the questioning took place[,]" we continue our review of the circumstances surrounding Defendant's questioning. *Olivas*, 2011-NMCA-030, ¶ 10.

**{24}** In contrast to those factors just discussed, there are several factors that lead us to conclude Defendant was in custody during his approximately 100-minute interview. First, Detective Babadi never told Defendant that he was not under arrest, nor that he could leave, or terminate the interview at any time. *Compare id.* ¶ 15 (explaining that the determination that the defendant was in custody was supported by the fact that the interviewing officers did not tell the defendant "that he was not under arrest, that he was free to leave the room if needed, or that he could terminate the interview by choice"), *with Munoz*, 1998-NMSC-048, ¶ 31 (rejecting the defendant's suggestion that he was under arrest during 100-minute long interview in part because an agent told the defendant he did not have to go with them, he did not have to talk with them, he was not under arrest, and he would be free to leave at any time).

**{25}** Second, we observe that Defendant was effectively prohibited from leaving the interview room. When Detective Babadi told Defendant that he needed to use the bathroom, Defendant immediately asked if he could also use the bathroom. Only after Detective Babadi returned from the restroom himself did he allow Defendant to leave the interview room under his escort. Defendant was thus not allowed to leave the interview room unattended. *Compare United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012) (concluding that the defendant was in custody in part because "he was free to use the bathroom or get a snack, but followed and monitored when he sought to do so"), *with Grayer v. State*, 647 S.E.2d 264, 269-70 (Ga. 2007) (finding that the defendant was not in custody since he was allowed to take unaccompanied bathroom breaks during the interview with police).

**{26}** Third, just one minute after Defendant asked Detective Babadi if he was going to need a lawyer, Detective Babadi patted Defendant down for weapons. Unlike *State v. Smile*, where this Court determined that the defendant was not in custody even though he was frisked for safety purposes, Defendant was not in a public location here but confined to an interview room. 2009-NMCA-064, ¶ 29, 146 N.M. 525, 212 P.3d 413; *cf. State v. Javier M.*, 2001-NMSC-030, ¶ 19, 131 N.M. 1, 33 P.3d 1 ("[I]nvestigatory detentions . . . are generally public, temporary, and substantially less coercive than custodial interrogations.").

**{27}** Detective Babadi's communications with Defendant ultimately compel a determination that the custody requirement was met in this case. Immediately after Detective Babadi informed Defendant of his *Miranda* rights, Detective Babadi confronted Defendant with his knowledge of Defendant's guilt and insisted that it was not "if" Defendant molested C.Y., but "why." Babadi also tried to obtain a written confession from Defendant by requesting that he write C.Y. an apology letter throughout the 100-minute interview and asked Defendant if there was any message that he would like C.Y. to receive from Detective Babadi.[2] Detective Babadi also used powerful persuasive techniques, saying that he was "trying to help," that he was trying to

---

[2]We observe that although Detective Babadi insisted that Defendant was not required to write C.Y. a letter, his actions throughout the interview belie his words as he instructed Defendant to write a letter on three separate occasions. Detective Babadi also coached Defendant how to apologize to C.Y., insisting that Defendant should not say sorry "if" he hurt C.Y. "[be]cause [C.Y.] knows what happened."

determine if Defendant was an "evil person," and by musing that Defendant must have been in love with C.Y. since Defendant had never molested his grandson. "A reasonable person faced with this degree of confrontational and accusatory questioning would have believed that he/she was in custody." *Olivas*, 2011-NMCA-030, ¶ 14.

**{28}** As the United States Supreme Court has explained, " 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). Detective Babadi's interactions with Defendant—in the context of the attendant circumstances already described—are emblematic of the coercive pressures inherent to custodial interrogations that gave rise to the need for *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 467 ("[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.").

**{29}** Based on the totality of the circumstances, we conclude that Defendant was in custody during his interview with Detective Babadi. Because Defendant was in fact subject to a custodial interrogation, we next turn to whether the *Miranda* warnings he received were adequate.

### III.   The *Miranda* Warnings Defendant Received Were Inadequate

**{30}** Defendant argues that the *Miranda* warnings he received were inadequate because he was not informed that "he had the right to counsel prior to and during questioning."[3] For the reasons that follow, we conclude that the *Miranda* warnings Defendant received were inadequate because they did not clearly convey to Defendant that he had a right to presence of counsel prior to, and during, his interview.

**{31}** The Fifth Amendment's protection against self-incrimination, as interpreted by the United States Supreme Court in *Miranda*, requires that an individual subject to custodial interrogation be informed that (1) "he has a right to remain silent"; (2) "any statement he does make may be used as evidence against him"; (3) "*he has the right to consult with a lawyer and to have the lawyer with him during interrogation*"; and (4) "if he is indigent[,] a lawyer will be appointed to represent him." 384 U.S. at 444, 467-73 (emphasis added); *see State v. Quiñones*, 2011-NMCA-018, ¶ 9, 149 N.M. 294, 248 P.3d 336. "These warnings must be clearly conveyed to the individual held for interrogation and are an absolute prerequisite before the interrogation can begin." *State v. Serna*, 2018-NMCA-074, ¶ 12, 429 P.3d 1283; *see also State v. Filemon V.*, 2018-NMSC-011, ¶ 48, 412 P.3d 1089 ("*Miranda* warnings must be given in a manner that is clearly sufficient to

---

3In his brief in chief, Defendant misquoted the *Miranda* warnings he received from Detective Babadi by adding the temporal phrase "during any and all questionings" with respect to the right to counsel. *See* Rule 12-318(A)(3) NMRA (explaining that a brief in chief must include "a summary of the facts relevant to the issues presented for review"). Counsel is reminded to craft their briefs in such a way that we may be able to wholly rely on them as part of our substantive review of the issues presented. *Cf. Martinez v. Sw. Landfills, Inc.*, 1993-NMCA-020, ¶ 13, 115 N.M. 181, 848 P.2d 1108 ("Neither the appellee nor the reviewing court should have to supplement the appellant's presentation of the evidence.").

grant the suspect an awareness of the right so the suspect can make a knowing, intelligent and voluntary choice to speak.").

**{32}** While no "talismanic incantation" of *Miranda* is required, warnings must—as a rule—clearly convey to an individual his or her constitutional rights against self-incrimination as provided for in *Miranda*. *California v. Prysock*, 453 U.S. 355, 359 (1981). As this Court observed in *Serna*, "[i]t is clear from both *Miranda* and subsequent decisions by the United States Supreme Court that there is a right to have and consult with counsel prior to questioning . . . . [and that t]his right must be conveyed as part of the *Miranda* warnings." *Serna*, 2018-NMCA-074, ¶ 18. "*Miranda* requires that a person be warned, at least implicitly, that they have a right to counsel prior to questioning." *Id.* ¶ 21.

**{33}** *Miranda* warnings, at their very essence, are necessary to ensure that individuals in custody faced with criminal prosecution know of their "precious rights" under the Fifth Amendment. *See Miranda*, 384 U.S. at 442 (explaining that the constitutional rights articulated in *Miranda* warnings were "fixed in our Constitution only after centuries of persecution and struggle"). The communication of the right to assistance of counsel and the protection against self-incrimination by law enforcement, prior to a custodial interrogation, is critical given the "profound impact" a confession may have on a jury at trial such that "we may justifiably doubt its ability to put them out of mind[.]" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks and citation omitted).

**{34}** The *Miranda* warnings provided to Defendant did not clearly advise Defendant that he had a "right to the *presence* of an attorney" during his interview. 384 U.S. at 444. (Emphasis added.) Instead, Defendant was advised, that he had "a right to a lawyer; and if you cannot afford a lawyer, one will be provided for you." Where, as here, "the balance of the warnings contain no 'before questioning' language—*or any other language, for that matter*—by which we could infer that the full right to counsel was adequately conveyed," and in the absence of language informing Defendant that he had the right to presence of counsel, we cannot reasonably conclude, under the facts of this case, that Detective Babadi adequately conveyed to Defendant that he had the right to have a lawyer present prior to, and during, his interview with law enforcement, if he so desired. *Serna*, 2018-NMCA-074, ¶ 24 (emphasis added); *see Miranda*, 384 U.S. at 471. Someone in Defendant's position could easily understand the warning to refer to his right to counsel if he was charged with a crime, not to a right to the presence of counsel before and during questioning. With an imperfect understanding of his rights, Defendant could not have validly waived his *Miranda* rights. *See Verdugo*, 2007-NMCA-095, ¶ 13. Under the facts of this case, we conclude that the district court committed fundamental error when it admitted the video recording of Defendant's highly inculpatory statements to Detective Babadi at trial. Because of this fundamental error, we reverse Defendant's convictions.

**{35}** Our holding today does not impose a requirement that *Miranda* warnings must include specific language that an individual subject to custodial interrogation has the right to counsel before and during questioning. *Cf. Prysock*, 453 U.S. at 355

(explaining that verbatim incantation of *Miranda* warnings was not required by the case itself, nor necessary to serve the purposes underlying *Miranda* warnings). Rather, we simply confirm that an individual subject to custodial interrogation must be informed that he has a constitutional right, among others, to the "presence of an attorney, either retained or appointed" before and during questioning. *Miranda*, 384 U.S. at 444. "Only through such a warning is there ascertainable assurance that the accused was aware of this right." *Id.* at 472.

## IV. Defendant's Ineffective Assistance of Counsel Claim Does Not Need to Be Reached

**{36}** Defendant alternatively argues that his counsel was ineffective for not challenging the adequacy of his *Miranda* warnings in the proceedings below. Since we reverse Defendant's convictions as a matter of fundamental error, Defendant would be entitled to no more relief than he has already received were he to prevail on this issue. Accordingly, we need not address his ineffective assistance of counsel claim. *See, e.g.*, *State v. Stanley*, 2001-NMSC-037, ¶ 44, 131 N.M. 368, 37 P.3d 85 ("In light of the reversal of the [other] issues, we do not review [the d]efendant's ineffective assistance of counsel claim[.]").

## V. Sufficient Evidence Supports Each of Defendant's Convictions

**{37}** Defendant argues that his "carbon-copy charges" violated his rights to due process and to be free from double jeopardy because there was insufficient evidence to distinguish between the counts.[4] Although we reverse each of Defendant's convictions because of the erroneous admission of his recorded statements, we address Defendant's claims regarding the sufficiency of the evidence to the extent necessary to ensure retrial is allowed.

**{38}** To begin, a review of the charging history against Defendant is necessary to our analysis.

**{39}** Defendant was initially charged with ten counts of CSP resulting in great bodily harm or emotional anguish, contrary to Section 30-9-11(D)(2), and thirty counts of CSCM, contrary to Section 30-9-13(B)(1).[5] Each count of CSP and CSCM identified an offense date of "on or about or between June 1, 2017 and October 14, 2017." An amended criminal information was later filed by the State to amend the CSP charges to CSPM.

---

4We note that Defendant's due process and double jeopardy arguments are unclear as these arguments are embedded within his insufficient evidence argument. Although appellate courts are under no obligation to review unclear or underdeveloped arguments, to the extent that we understand Defendant's arguments, we address whether Defendant's indictment included carbon-copy charges that violated his due process and double jeopardy rights. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (explaining that appellate courts are not required to review unclear or undeveloped arguments). 5Defendant was also charged with one count of contributing to the delinquency of a minor, contrary to NMSA 1978, Section 30-6-3 (1990).

**{40}** Prior to trial, Defendant moved to dismiss nine counts of CSPM and twenty-nine counts of CSCM as violative of his due process and double jeopardy rights. In response, the State filed a second amended criminal information, which included one count of CSPM with an offense date of June 1, 2017, and twenty-five counts of CSCM. The second amended criminal information reflects the State's intent to distinguish each CSCM charge by distinct five-day time periods between August 1, 2017 and October 12, 2017.[6]

**{41}** As a preliminary matter, we note that counts twenty through twenty-six in the second amended criminal information contain typographical errors with respect to the five-day charging periods. These typographical errors appear to have been undetected until now as neither party alerted the district court of the errors, nor raise the errors on appeal. Because neither party has claimed prejudice in this regard, we need not address these errors any further. *See* Rule 5-204(A) NMRA ("A complaint, indictment, or information shall not be deemed invalid, nor shall the trial, judgment, or other proceedings thereon be stayed, arrested, or in any manner affected, because of any . . . error . . . therein which does not prejudice the substantial rights of the defendant upon the merits."); *see also* Rule 5-204(D) ("No appeal, or motion made after verdict, based on any such defect, error, omission, repugnancy, imperfection, variance, or failure to prove surplusage shall be sustained unless it is affirmatively shown that the defendant was in fact prejudiced in the defendant's defense on the merits.").

**{42}** Notwithstanding the amended charges in the second amended criminal information, Defendant maintained his motion to dismiss all but one count of CSCM. After a hearing on the motion, the district court entered an order denying Defendant's motion to dismiss finding in part that,

> 3.  Defendant's argument that he is unable to tell what count applies to what particular conduct is unavailing where, as here, each count is alleged to have occurred at a time distinct from every other count charged.
>
>          . . . .
>
> 6.  Due process as to the charging document is not offended when . . . Defendant is informed against by the State in its criminal information of criminal sexual activity . . . Defendant has allegedly acknowledged as occurring [twenty-five] to [thirty] times. It is the combined anticipated evidence by which the [four]-month charging period has been chopped into [twenty-five] counts of CSCM; evidence of which . . . Defendant has been apprised.

**{43}** In *State v. Lente*, 2019-NMSC-020, 453 P.3d 416, our Supreme Court "provided new guidance on evaluating due process, multiplicious double jeopardy, and sufficiency

---

[6]On the face of the second amended criminal information, the State explained in part that "specific different days have been alleged for each count to differentiate the CSC[M] counts."

of the evidence challenges in 'resident child molester cases'[.]"[7] *State v. Costillo*, 2020-NMCA-051, ¶ 27, 475 P.3d 803. A prerequisite to judicial review of an indictment or criminal information challenged on due process and multiplicity grounds, as *Lente* explained, is that the defendant "must have 'filed pretrial objections to the [charging instrument] or demanded any additional pretrial specification of the charges'–i.e., seeking a bill of particulars—*before* trial." *Costillo*, 2020-NMCA-051, ¶ 28 (quoting *Lente*, 2019-NMSC-020, ¶ 16). Where, as here, there is no record of Defendant pursuing a challenge to the charging instrument on due process or notice grounds, our review of Defendant's double jeopardy and due process claims is precluded.[8] *See Costillo*, 2020-NMCA-051, ¶ 28 ("A defendant who fails to object to the indictment on notice or due process grounds is precluded from first doing so after trial." (alterations, internal quotation marks, and citation omitted)). Nevertheless, Defendant and the State are "free to pursue whatever course of action they consider to be warranted under *Lente* on remand, including issues related to the remaining charges contained within the criminal information." *Id.*

{44}   Although we decline to review Defendant's due process and double jeopardy claims for the reasons explained, we review the sufficiency of the evidence to ensure that retrial is not barred. *See State v. Post*, 1989-NMCA-090, ¶ 22, 109 N.M. 177, 783 P.2d 487 ("If all of the evidence, including the wrongfully admitted evidence, is sufficient, then retrial following appeal is not barred [by double jeopardy].").

{45}   "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *Montoya*, 2015-NMSC-010, ¶ 52 (internal quotation marks and citation omitted). In reviewing the sufficiency of the evidence, we consider all the evidence admitted, even that which was wrongly admitted. *See Post*, 1989-NMCA-090, ¶ 22. We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Cunningham*, 2000-NMSC-009, ¶ 26. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

{46}   As our Supreme Court has explained, the prosecution of resident child molesters presents unique challenges. *See Lente*, 2019-NMSC-020, ¶ 1 ("The prosecution of resident child molesters presents unique challenges rarely present in prosecution for other crimes." (alteration, internal quotation marks, and citation omitted)). Central to such prosecutorial challenges is that "[t]he child victims in these cases are usually the sole witnesses of the crimes perpetrated and, because of their age and the frequency of

---

[7]Resident child molester cases are those that "generally involve defendants who have regular access to and control over children whom they sexually abuse in secrecy for long periods of time." *Lente*, 2019-NMSC-020, ¶ 1.

[8]Our review of the record reveals that at no point did Defendant demand a bill of particulars. To the extent that Defendant filed a motion to dismiss certain CSPM and CSCM counts as violative of his due process rights, we do not understand *Lente*'s requirement that a defendant "file[] pretrial objections to the indictment or demand[] any additional pretrial specification of the charges" to be satisfied by the filing of a motion to dismiss as was the case here. *Lente*, 2019-NMSC-020, ¶ 16.

the sexual abuse to which they are subjected, cannot provide detailed accounts of the abuse but only generalized accounts of frequent sexual contact with the defendant." *Id.*

{47}    In these types of cases, "a child victim in a resident child molester case must, at a minimum, provide testimony satisfying the following three requirements for multiple convictions to survive sufficiency review": (1) "the child victim must describe the proscribed act or acts committed with sufficient specificity to establish that unlawful conduct did in fact occur and to permit a jury to differentiate between the various types of sex acts to which the child victim was subjected"; (2) "the child must describe the number of proscribed acts committed with sufficient certainty to support each of the counts alleged in the information or indictment"; and (3) "the child must describe the general time period in which the proscribed acts occurred." *Id.* ¶¶ 67-70.

{48}    C.Y.'s testimony sufficiently established that Defendant committed multiple instances of criminal sexual contact and at least one instance of criminal sexual penetration. When asked to explain on direct examination what happened between him and Defendant, C.Y. testified as follows,

> [State]: Tell [the] jury what happened.
>
> [C.Y.]: He touched my private parts.
>
> [State]: Okay. When you say your private parts, do you have a word for that?
>
> [C.Y.]: No.
>
> [State]: Would he touch your private parts under your clothes or over your clothes?
>
> [C.Y.]: Under.
>
> [State]: Under your clothes. Okay. And is one the private parts . . . of you know when you go pee, is that the private part he was touching?
>
> [C.Y.]: Yes.
>
> [State]: How often would he do that when you went over there, [C.Y.]?
>
> [C.Y.]: Every day.
>
> [State]: When you went over there?
>
> [C.Y.]: Yes.
>
> [State]: Did he ever do anything else to you?

[C.Y.]: No.

[State]: Did he ever touch your private parts with anything else?

[C.Y.]: No.

[State]: Okay. So, he just touched you?

[C.Y.]: Yes.

. . . .

[State]: You said he touched your private parts, and did he use his hands to touch your private parts?

[C.Y.]: Yes.

[State]: Did he ever use any other party of his body to touch your private parts?

[C.Y.]: No.

[State]: [C.Y.], tell [the] jury what the word "suck" means.

[C.Y.]: It means he does bad stuff to your private parts.

[State]: He does bad stuff to your private parts, how?

[C.Y.]: He touches it and other stuff like that.

[State]: And what other stuff is that?

[C.Y.]: He puts his mouth, he puts your private part in his mouth.

[State]: Did that happen here?

[C.Y.]: Yes.

[State]: Do you know when it happened?

[C.Y.]: I don't remember that.

**{49}** Defendant relies on the fact that C.Y. did not recall living in Kirtland, nor did C.Y. accurately recall the time of year during which he moved next door to Defendant to support his contention that there was insufficient evidence to support his multiple convictions. Although C.Y.'s testimony lacked certainty in regards to the timing of when

he resided in New Mexico, the testimony by Mother and Father that C.Y. lived in Kirtland next to Defendant for four months in 2017 adequately defines the time period of the abuse.

**{50}** Mother's testimony regarding the frequency of C.Y.'s presence at Defendant's trailer corroborates C.Y.'s testimony, as does A.Y.'s testimony that she once walked into Defendant's trailer and saw Defendant's hands in C.Y.'s pants and C.Y.'s hands in Defendant's pants. *See Lente*, 2019-NMSC-020, ¶ 62 ("When a young child is the victim of a crime, it is often impossible to ascertain the exact date when the crime occurred. He or she may have only a vague sense of the days of the week, the months of the year, and the year itself." (internal quotation marks and citation omitted)). Moreover, we disregard all inferences to the contrary to upholding the jury's verdict. *See Rojo*, 1999-NMSC-001, ¶ 19.

**{51}** Of particular importance to our conclusion that sufficient evidence supports Defendant's multiple convictions are his own inculpatory statements. *See State v. Martinez*, 2007-NMCA-160, ¶ 13, 143 N.M. 96, 173 P.3d 18 ("Important to our evaluation of the evidence is [the d]efendant's admission."). In his interview at the sheriff's department, Defendant admitted to Detective Babadi that he had touched C.Y.'s penis between twenty and thirty times and that he had put C.Y.'s penis in his mouth at least once. Defendant's own admission regarding the number of times he had touched C.Y.'s penis and had put C.Y.'s penis in his mouth—taken together with the testimony of C.Y., A.Y., and Mother—provides sufficient evidence from which a jury could find twenty-one separate instances of CSCM and one instance of CSPM.

**CONCLUSION**

**{52}** For the foregoing reasons, we conclude that the district court fundamentally erred when it admitted Defendant's video-recorded statements at trial because Detective Babadi did not adequately apprise Defendant of his *Miranda* rights. We reverse Defendant's convictions and remand for a new trial.

**{53} IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**BRIANA H. ZAMORA, Judge**

**JANE B. YOHALEM, Judge**